### In re THE BROWNING CRANE & SHOVEL COMPANY, Debtor.

United States District Court, N. D. Ohio, E. D.

No. 70895.   Decided July 8, 1955.

Sidney D. L. Jackson, Jr., James P. Garner, George L. Ford, Hostetler & Patterson, Cleveland, for Dart.

Bernard H. Schulist, Andrew J. McLandrich, Cleveland, for debtor in possession.

## OPINION

By FRIEBOLIN, Referee in Bankruptcy:

To the Honorable Judges of the District Court:

C. D. Friebolin, one of the referees of said court, do hereby certify that, in the course of the above entitled proceedings before me, I considered the petition for reclamation of the Dart Truck Co. (hereinafter sometimes referred to as "Dart") for possession of two crane carrier chassis (sometimes referred to as "chassis" or "crane carriers") claiming title thereto and alleged to be in possession of the debtor at the time the debtor filed its petition for an arrangement under Chapter XI of the Act, 11 U. S. C. A. §701 et seq., and continuing in the possession of the debtor-in-possession when appointed as such.

The debtor-in-possession (sometimes hereinafter referred to as "Browning") filed answer denying Dart's title and right to possession. No issue was made of actual possession by the debtor nor of the debtor-in-possession.

After extensive hearings had, oral argument and briefs presented, I made findings of fact and conclusion of law, and thereon entered an order denying and dismissing Dart's petition for reclamation. Said order is transmitted herewith and marked Ex. A.

The question presented is, primarily, whether Dart had title to the two crane carrier chassis, on Dec 9, 1953, which was the date upon which the debtor filed its petition for an arrangement and when the debtor was duly appointed debtor-in-possession, by this court.

The collateral, but more immediate questions were (1) whether the transaction, the contract of sale, disregarding the Ohio Vehicle Law, vested title in the debtor about Nov. 6, 1953; and (2) whether under the Ohio Vehicle Law, such title in the two chassis, vested in the debtor conceding that possession was delivered to the debtor.

Since my findings of facts and conclusions of law embody a description of the pleadings, the issues presented, and a general summary of the evidence, it will probably be sufficient to embody the document herewith; a complete transcript of the evidence is transmitted herewith, marked Ex. D; the exhibits are also transmitted herewith, marked Ex. E.

### THE PLEADINGS

Dart filed a petition for reclamation alleging that on or about Nov. 6, 1953, Dart delivered possession of the two chassis to Browning; that they were delivered under an agreement that Browning deliver to Dart, chattel mortgages on said chassis and notes securing the purchase price, and upon receipt thereof to deliver title of the chassis to Browning.

It is further alleged that Browning never delivered the required mortgages and notes and that Dart had not delivered title to the aforesaid chassis; that the price of one chassis was $12,800, upon which Browning paid $1,280 in cash, leaving a balance of $11,520; and the price of the other was $13,200, of which $1,320 was paid, leaving a balance due of $11,880, to which Dart is now entitled.

It is alleged, also, that one chassis—price $12,800 and $11,520 due—was sold by Browning before the arrangement proceeding was begun and that the debtor has agreed with Dart that, in consideration of Dart's

releasing such purchaser from any claim Dart might have, debtor has agreed to segregate the first $11,520 of the sale price to await determination by this court of the rights of the parties hereto.

Dart prays for possession of the one chassis in debtor's possession at the date of the bankruptcy proceeding (Dec. 9, 1953) and for an order to pay to it the sum of $11,520 received upon the sale of the other chassis, as stated in its petition herein.

Browning in its answer admits the sale of the second chassis and the agreement to segregate the money received upon its sale as stated in the Dart petition; admits the sale and delivery of the two crane carrier chassis, denies any agreement to give a mortgage as security, denies nondelivery of title and Dart's right to possession.

## THE ISSUE

As appears from the pleadings, the evidence and briefs of counsel, the primary issue is: In whom was title to the two chassis at the date of bankruptcy, that is, on Dec. 9, 1953? In turn, this depends upon (1) the terms of the agreement of purchase between the parties, (2) its effect, in view of the bankruptcy proceedings and possession by the debtor at or before that date, and (3) its effect in view of the Ohio Certificate of Title Law.

## THE EVIDENCE—GENERALLY

The article in question: A chassis or carrier chassis, as here involved, is the underpart, the base or frame, of a truck crane or power crane as manufactured and sold by Browning. This carrier chassis, like an ordinary automobile chassis, has wheels, gas tank, lights, and a cab, etc. But it also has certain other distinctive features built according to specifications furnished by Browning (Ex. 119) which will adapt the chassis to the purpose for which Browning makes a truck crane which it sells. This distinctive equipment consists of substantially heavy material—weight sometimes 25 tons—outriggers and screw jacks as shown by Ex. 2, 117 and 201. The completed truck crane as factored and sold by Browning is shown in Ex. 10, 11 and 116.

Both parties introduced oral and documentary evidence relating to the purchase agreement for the two chassis. There is in this respect a conflict of testimony in respect to Dart's claimed agreement of a mortgage as a condition precedent to passing title.

Upon the question of the effect of the delivery of possession of the chassis to the debtor prior to bankruptcy and its effect in view of the Ohio Certificate of Title Law, §4505.01 et seq, R. C., both parties called witnesses respecting the enforcement of that act in connection with vehicles of this kind, and some paper exhibits. In essence this involves interpretation of certain sections of that act. Oral testimony on behalf of the petitioner, Dart, was given by three witnesses, including 15 paper exhibits; on behalf of the debtor by five witnesses, including 13 paper exhibits. The transcript comprises 355 pages, with 28 paper exhibits.

## FINDINGS OF FACT

I find that:

1. On or about Oct. 15, 1953 (see Webster R. 24 and Ex. 101 and 102) Mr. Gilbertson, purchasing agent for Browning, in Cleveland, called

Dart at Kansas City, by telephone and spoke to Mr. Webster, treasurer of Dart, advising him that Browning needed two more crane carrier chassis similar to the one previously purchased by Browning from Dart. This conversation finally culminated in the oral agreement to purchase the two carrier chassis involved in this proceeding.

2. Prior thereto, Browning had purchased from Dart four carriers all upon open account with ½ per cent discount if payment made in 10 days. The first purchase was in April, 1953—there were two purchases in April; one in June, 1953 and one in August. The first three were paid for promptly; the first two within the discount period. The August purchase was not paid for until Oct. 1953.

3. In the telephone conversation of Oct. 15, 1953, Mr. Gilbertson for Browning told Mr. Webster of Dart that Browning needed 30 days for payment "to accommodate this sale" (R. 25). Mr. Webster understood that Browning's reason for wanting 30 days after delivery for payment, was to enable Browning "to complete their production and their financing sources, and in return to pay us." (R. 36) Mr. Webster told Mr. Gilbertson that Dart would not sell on open account to be paid for in 30 days for the reason that it was not Dart practice and for the further reason that Browning had been slow in payment for the last carrier (R. 25, 105). A tentative proposal, to be confirmed by the respective companies, was suggested: Browning to pay 10% cash with the order and a promissory note, payable in thirty days after delivery, for the balance secured by a chattel mortgage upon the vehicles. (R. 25) Contra testimony by Mr. Gilbertson (R. 105, 113, 120-128).

4. On or about Oct. 19, Mr. Gilbertson called Dart by phone, and the tentative proposal, having been approved by the officers of the respective parties, was confirmed by Mr. Webster—and in part by Mr. Ross for Dart—and Mr. Gilbertson (R. 26, 106, Ex. 112, 118). Mr. Gilbertson gave Dart Browning's purchase order numbers. (R. 106, 45) Dart proceeded at once to manufacture the carrier chassis (R. 30).

5. Oct. 26, 1953—the delay is explained by Mr. Gilbertson (R. 107)—Browning sent two purchase orders of said date (Ex. 104 and 105) to Dart with a check for 10% of the purchase price. Each order stated: "The balance to be covered with a 30 day note due 30 days after shipment of completed vehicle from your premises. This confirming arrangement made with your treasury department. Confirming to Mr. Ross—phone 10/19/53. Exempt from sales and use tax—State of Ohio * * * Shipp Schedules: Date 11-5-53." There was no response by Dart to the failure to include the word "mortgage" with a note.

6. On Oct. 29, 1953, Dart, by letter of that date signed by W. E. Ross, sales engineer of Dart, acknowledged receipt of the two purchase orders and checks. The letter also stated that they were planning delivery by Nov. 5 and that Mr. Webster "will handle the necessary arrangements for handling the notes on these two orders."

7. On or about Nov. 6, 1953, Dart made delivery of the carrier chassis, that is, turned them over to a drive-away concern which transported them to Browning. (R. 30) This required, normally, four or five days (R. 31). They were delivered to Browning Nov. 11 (R. 112; Ex 107 and 108).

8. On Nov. 6, Dart sent invoices of that date to Browning (Ex. 107 and 108); they merely describe the property, referred to Browning's Order Number and date of shipment and the price, no item of excise tax was listed thereon. (Ex. 107 and 108.) Dart also made out a "Manufacturer's Statement of Origin to a Motor Vehicle," as of that date directed to Browning, describing, respectively, these two "Crane carriers." These statements certify that the vehicles described, the property of Dart, "has been transferred this 6th day of Nov. 1953 to Browning Crane & Shovel Co., * * *." They were not then nor at any other time delivered to Browning, remaining in the possession of Dart.

9. It had been the practice of Dart to prepare and deliver such manufacturer's statements to purchasers, including Browning, with the invoice in open account transactions (R. 28); they were withheld in security transactions (R. 28). Dart furnished the statements in all sales of its vehicles regardless of the customer or the state in which he lived (R. 29). Browning customarily received such statements from suppliers of trucks (R. 128).

10. Dart intended to hold the Manufacturer's Statement of Origin until receipt from Browning of the note and mortgage which the latter was to execute and deliver.

11. On Nov. 13, 1953, Dart mailed a letter of that date to Browning (Ex. 5) enclosing a note for the balance due of $23,426.00 and a mortgage covering the two carrier chassis, asking that Browning execute them with proper acknowledgement on the reverse side of the chattel mortgage and return them promptly. Attention was called to the fact that these documents bear date of Nov. 14, 1953, rather than the date of invoice (Nov. 6, 1953) "to allow for time elapsed in delivery." (Ex. 6 and 7, R. 36.) The note bears the notation that it is to be secured by chattel mortgage. (R. 32, Ex. 6.) Browning received the letter with the enclosed note and mortgage.

12. On Nov. 24, 1953, not having heard from Browning, Mr. Webster wired Mr. Gilbertson (Ex. 8) asking "when we will receive documents sent to you Nov. 13 for execution." On Nov. 25, 1953, Mr. Gilbertson wired Dart in reply stating that "notes will be mailed to you Friday, Nov. 27" (Ex. 9).

13. At the time Browning received the letter of Nov. 13, enclosing the documents from Dart, Mr. Gilbertson took the note and chattel mortgage to Mr. Carey (referred to as Barey in transcript), the president of Browning, for signature (R. 26). Upon receiving Dart's letter of Nov. 24, 1953, Mr. Gilbertson was alerted to the fact that they had not been signed. On Dec. 1, 1953 Mr. Gilbertson called Mr. Webster and told him that the papers were still on Mr. Carey's desk; that he had tried to get them signed and that Dart had better send a representative to call on Mr. Carey (R. 35). Before Dart found time to act, the petition for an arrangement was filed.

14. When the purchase agreement was made on October 19, 1953, Dart knew that Browning intended, upon delivery of the carrier chassis, at once to equip them with their peculiar mechanisms and devices and to sell them or dispose of them in some manner in order to obtain the money in order to pay Dart within the thirty day period (R. 36). Dart

delivered them with that understanding, which involved passing of title. Dart intended to deliver the Manufacturer's Statements of Origin upon receipt of the note and mortgage (R. 68-70).

15. The carrier chassis were built by Dart according to the specifications submitted by Browning (Ex. 119) and proceeded to build them at once after the conversation of Oct. 19, 1953.

16. These carrier chassis were built and designed for and adapted to the installations by Browning of its own mechanisms to complete a truck crane or power crane; they were not designed for the purpose of hauling, general highway transportation, or other purposes; they were not adaptable, practically, for any other purpose (R. 62-64).

17. These carrier chassis could be moved by their own power over the highways. They were driven by Dart, rather by the transit concern employed by Dart, from its place of business and delivered to Browning. In such transit the transit concern obtained permits for that purpose. (R. 146, Ex. 115).

18. These carrier chassis, after delivery to Browning, were factored into a Browning Truck Crane and were not used for any other purpose. As such truck crane, they were intended to be moved from place to place over the highway to the place where they performed their particular function as power truck cranes.

18½. The cranes built by Browning upon the chassis involved herein —not the chassis as such—were not used in construction work.

19. It was not the custom of Browning, over many years of activity in selling their power cranes, to obtain Manufacturer's Statements of Origin (although the suppliers of trucks customarily supplied such statements, R. 128), nor to deliver to buyers of their cranes, certificates of title as they are described in the Motor Vehicle Law of Ohio. They did usually deliver to the buyer certificates of weight (R. 78; Ex. 120) for purposes of taxation.

20. Enforcement officers of the Ohio Motor Vehicle Law have no rule nor practice respecting the necessity of delivery of Manufacturer's Statements of Origin to pass title to buyers from a manufacturer, of carrier chassis. They had no knowledge of the issuance of a certificate of title for a crane carrier.

### CONCLUSIONS OF LAW

1. Browning and the debtor in possession, being in possession of the carrier chassis (as part of a Browning Truck Crane), the burden of proof is upon Dart, the reclaiming petitioner, to establish its title and right to possession of these chasis.

2. The debtor in possession stands in the position of a trustee in bankruptcy—Section 342 of the Bankrupcy Act, 11 U. S. C. A. §742. As such, he is in the position of a creditor vested, as of Dec. 9, 1953, with all of the rights, remedies and powers of such creditor then holding a lien upon all of the property of the debtor in its possession or control. Section 70, sub. c. of the Act, 11 U. S. C. A. §110, sub. c.

3. Dart under its agreement of sale, intended to sell the two chassis to Browning, payable within 30 days and the execution of a mortgage after title passed to the purchaser. The giving of the note and mortgage

was not a condition precedent to passing title. If that had been Dart's intention, it was waived by its conduct as appears from the finding of facts. Title as well as possession passed to Browning prior to Dec. 9, 1953.

4. That Dart's intention was not to retain title is evident from its knowledge as testified by its own witness, that Dart knew that Browning would need the property and necessarily, title, in order to obtain the money or the financing in order to pay for the chassis. This clearly implied that Browning was to equip the chassis with its own mechanisms and devices and to dispose of the completed truck crane by sale if necessary.

5. Dart would have an equitable lien—at least upon the chassis still in possession of Browning on December 9, 1953—by reason of its agreement for a mortgage upon both of them, except for the fact that on Dec. 9, 1953, the property came into the custody of the Bankruptcy Court and the debtor in possession was endowed with the title and rights of a levying creditor.

6. In the position of a levying creditor, Dart's agreement for a mortgage is not valid against a debtor in possession. The mortgage was void because not filed for record to perfect it against a levying creditor.

Possession by Dart prior to Dec. 9, 1953, would not have made the mortgage vulnerable on this ground.

7. Dart contends (1) that these carrier chassis are "motor vehicles"[1] as defined in the Ohio Motor Vehicle Act and (2) that accordingly, under such act, no title to such chassis can be held to have passed to Browning.

The two sections relied upon by Dart are §4501.01 R. C., which defines the term "motor vehicle" and §4505.04 R. C., which provides in substance,[2] that no court in any case at law or equity shall recognize the right, title, claim or interest of any person in or to any motor vehicle sold or dis-

---

1. (Emphasis supplied), §4501.01 R. C.: "Definitions * * * (A) 'Vehicles' means every thing on wheels or runners, except vehicles operated exclusively on rails or tracks or from overhead electric trolley wires * * * (B) 'Motor vehicle' means any vehicle propelled or drawn by power other than muscular power or power collected from overhead electric trolley wires, except road rollers, traction engines, power shovels, *power cranes*, and other equipment used in construction work and not designed for *or employed* in general highway transportation, well drilling machinery, ditch digging machinery, farm machinery * * *."

2. (Claimant in its brief filed July 19, 1953, inadvertently, omitted a phrase of this section which, however, is not material in this case.) *Sec. 4505.04 R. C.*: "Certificate of title as evidence of ownership. No person acquiring a motor vehicle from the owner thereof, whether such owner is a manufacturer, importer, dealer, or otherwise, shall acquire any right, title, claim, or interest in or to said motor vehicle until such person has had issued to him a certificate of title to said motor vehicle, or delivered to him a manufacturer's or importer's certificate for it; nor shall any waiver or estoppel operate in favor of such person against a person having possession of such certificate of title, or manufacturer's or importer's certificate for said motor vehicle, for a valuable consideration.

posed of, or mortgaged or encumbered, unless evidenced by a certificate of title or a manufacturer's or importer's certificate issued in accordance with the motor vehicle law. Immediately prior to this provision, the section says that no person acquiring a motor vehicle from the owner whether the owner be a manufacturer, dealer or otherwise shall acquire any right, title, claim or interest in or to said motor vehicle until such person has had issued to him a certificate of title to said motor vehicle or delivered to him a manufacturer's or importer's certificate for it; nor shall any waiver or estoppel operate in favor of such person against a person having possession of such certificate of title or manufacturer's certificate for said motor vehicle.[3]

8. These carrier chassis are not "motor vehicles" within the definition as given in §4501.01 R. C. They are not designed for general highway transportation, nor were they used in general highway transportation.

9. When all of the sections of the Motor Vehicle Act are read together, it is evident that the purpose of the definition of "motor vehicles" was to exclude vehicles, even though motor driven, which were not habitually and customarily in the performance of their function and purpose, operated and driven on the public highways. These carrier chassis as such were clearly not intended to be, nor actually, operated on the highways. The only time that these chassis as chassis were driven on the highway was when they were driven from the plant of Dart to the plant of Browning.

10. In this reclamation petition, although Dart may ask for delivery to it of a completed truck crane, the only articles that it sold or otherwise disposed of to Browning were two chassis. Their manufacturer's certificate described only the two chassis.

11. In maintaing the allegations of its petition for reclamation, Dart

---

"No court in any case at law or in equity shall recognize the right, title, claim, or interest of any person in or to any motor vehicle sold or disposed of, or mortgaged or encumbered, unless evidenced:

"(A) By a certificate of title or a manufacturer's or importer's certificate issued in accordance with §§4505.01 to 4505.19, inclusive, R. C.

"(B) By admission in the pleadings or stipulation of the parties."

3. There are a number of other provisions respecting motor vehicles which, perhaps, have some relevance. The only provision I find *requiring* a manufacturer to deliver a certificate, is §4505.05 R. C. It provides that no manufacturer shall sell or dispose of a new motor vehicle to a dealer for display and resale without delivering a manufacturer's certificate.

*Sec. 4503.02 R. C.* provides for the levy of an annual license tax upon the *operation of motor vehicle* on the public highways.

*Sec. 4503.11 R. C.* requires annual application for registration by the owner of a motor vehicle *operated and driven upon the public highway.*

*Sec. 4503.33 R. C.* provides for an "in transit permit" to drive-away operators engaged in the business of transporting or delivering new motor vehicles.

*Sec. 4505.03 R. C.* provides that no person, except manufactures shall sell or otherwise dispose of a motor vehicle without delivering a certificate of title.

has not, as provided in §4505.04 R. C., introduced in evidence a certificate of title to itself of these chassis, nor a manufacturer's certificate to itself of these articles. This section purports to say that no court may recognize its title or claim in the absence of such evidence.

12. The petitioner has not sustained the allegations of its petition, and its petition should be dismissed.

### COMMENT

1. It is only with respect to the agreement of sale and the alleged requirement of a mortgage back to Dart that there is any substantial conflict as to facts.

Both parties were rather ambiguous in referring to it in their writings (see exhibits heretofore mentioned). I have found that Mr. Webster's oral testimony on that point is the more credible. Mr Gilbertson, for Browning, seemed less sure because the uncertainties of financing weighed more heavily on his mind. The fact that when the letter from Dart with note and mortgage was actually received by Mr. Gilbertson and no question or objection was raised, seems to substantiate this finding. (Finding No. 13.)

2. That the execution of the note and mortgage by Browning were not conditions precedent to transfer of title, appears quite evident from the entire transaction and the conduct of the parties after the sales agreement was made.

Sec. 1315.19 R. C. expressly provides that in a contract for specific goods, the property in them is transferred to the buyer at such time as the parties intend it to be transferred. Also, that for the purpose of ascertaining the intention, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case.

The conduct of the parties, their own interpretation of the contract, is usually the most persuasive. In the first place, of course, Browning could give no mortgage until it had title. But Dart might have exacted a contemporaneous exchange—it did not. Immediately, after Oct. 19 it began to manufacture the chassis and delivered them without requesting the note and mortgage. More relevant is the fact that Dart was told, and knew, that within the thirty day period, Browning intended to process the trucks, that is, to use the chassis and proceed with its business in order to get its money out of the completed power crane. Such conduct is inconsistent with any intention not to pass title to the chassis. Clearly, Browning never intended that the property in these chassis should not pass when delivered. Cases cited by counsel seem not to require any other conclusion under the facts and circumstances. Moreover, not until the petition herein was filed was Browning ever expressly advised or reminded that the property, the title, in the chassis had not been transferred.

3. With respect to the right, title and remedies of a debtor in possession, little need be said. Dart seems to have abandoned any challenge in this regard. In any event it is clear that a debtor in possession is, in legal effect, in the position of a trustee in bankruptcy. Section 342 of the Bankruptcy Act. 8 Collier on Bankruptcy (14 Ed.) p. 802. As such, he may assert the rights of a levying creditor as of Dec. 9, 1953.

4. Whether or not these two chassis or carrier chassis were, by express statutory definition, "motor vehicles" proved to be a perplexing question to the court—and seemingly also to counsel.

If these chassis were within the definition of a "motor vehicle," that is a vehicle propelled "by power other than muscular power or power collected from overhead electric trolley wires, **except** \* \* \* power shovels, power cranes, and other equipment used in construction work and not **designed** for or employed in general highway transportation, well drilling machinery, ditch digging machinery \* \* \*"—they were subject to the various provisions in the Motor Vehicle Act.

It seems evident that when Browning took these chassis and, using them as a base, manufactured a power crane, the latter was excluded from the definition of a motor vehicle. (Sec. 4505.01 R. C.); note 1, also). Can it be said that the chassis alone, which became a sort of framework for the contemplated article or vehicle: the power crane, can be held **not** excluded? It doesn't seem to make sense.

It does seem, reading the various sections of this act, the purpose of the entire act and the intention to include only motor vehicles which in pursuance of their chief purpose, design, and function customarily use the highway, that these chassis are not within the definition of motor vehicle.

These chassis, as such, used the highways just once: when they were driven from Dart's place of business to that of Browning. They were made by Dart, explicity and specifically **designed** for the building and completion of a power crane, which latter clearly was excluded from the definition. Certainly, by merely looking at these chassis any one could see that as they stood and traveled the highway, they were not **designed** nor adapted for nor employed in, general highway transportation. It is motor vehicles designed for or employed in general highway transportation which it is intended should be governed by the provisions of the Motor Vehicle Act.

Counsel have found no case in point, and I have found none. Counsel for Dart have cited a number of cases but they refer to a completed vehicle and using the highway for the chief purpose for which it was built. Those instances would be analogous to the case at bar **if** we were discussing the question of exclusion of Browning's power crane from the definition; that is not our question. We are concerned with a chassis admittedly manufactured for and designed to be part, the bottom part, of a power crane which latter, as such, is not involved.

For example, in Burdett Oxygen Co. v. Kauer (1955), 117 N. E. (2d), 211, the question at issue was the weight of a motor vehicle for purposes of taxation. The facts were stipulated. The court held that certain articles were inherently truck equipment and others not.

In **State ex rel. Yontz v. West** (1938), 61 Oh Ap 382, 12 O. O. 506, 22 N. E. (2d), 645, a taxpayer brought suit in mandamus against the registrar of motor vehicles to require him to collect a license tax from the owners of a cement-mixing vehicle. The writ was granted, the court holding that the vehicle—it was a complete vehicle performing as such—was not excepted from the definition of motor vehicle, because it was not a "power shovel or power crane used in construction work and not designed for or employed in general highway transportation."

After stating that a license tax is to be devoted to purposes incidental to maintaining the highways and incidental purposes, the court says this vehicle was a mixing device **mounted on a chassis**, made more efficient because of its ready **transportation of cement to the job;** that transportation over the highways and streets is an essential element of the economics to be secured by the use of the mixture which is already mixed or mixed during transportation. It is evident that this case is far from being relevant to a **mere chassis** that has no purpose except to become part of a power crane.

State ex rel. Tejan v. Lutz (1934), 31 N. P. (N. S.), 473. In this case the petitioner sought a writ of mandamus to require the registrar to issue licenses for plaintiff's trucks. The issue related to the weight of the trucks as trucks with their inherent full equipment. The question was similar to that in the Burdette Oxygen case, supra. No chassis was involved, and no question of exclusion of a particular kind of vehicle.

Dart also cites and quotes at some length from a New York case: People v. Ward, Inc. (City Court of Rochester 1947), 189 Misc., 288, 74 N. Y. S. (2d), 181 (Dart reply brief Aug. 4, 1954, page 6). Defendant was charged with violation of the N. Y. Vehicle Law for operating a motor vehicle without license plates. He claimed that the vehicle was a "tractor crane" and therefore excepted. Apparently the judge found the vehicle not exempt, chiefly because it had been "refined" to increase its mobility and speed of movement rather than its stability while at a particular location.

In some respects the vehicle in question resembles the Browning Power Crane. It does even remotely resemble the two chassis which are the subject of the case at bar. It might be mentioned that a later case in New York—Peoples v. Felder (Mag. Ct., 1952), 116 N. Y. S. (2d), 39, 43, the court declined to follow the Ward case (as well as the Cox case: People v. P. T. Cox Const. Co., 172 Misc., 244, 15 N. Y. S. (2d), 756, cited in Ward) stating that in the meantime the legislature had expressly exempted "truck cranes" from the Motor Vehicle Act—as the Ohio law does today.

In the Felder case the "tractor crane" described was held exempt although it was merely a tractor the front end of which had a shovel attachment; it was an "instrument [in] a complete integrated unit * * *. It is adapted only for restricted uses. It does not carry passengers or materials * * *. It does not move over the highways in the accepted sense that a true motor vehicle does. * * * It is a highly specialized piece of machinery. Its use of the highways is only incidental in going from one job to another and in moving about in the performance of its work. * * *" it is a power shovel mounted on a truck.

In Liberty Mutual Insurance Co. v. Dooley Electric Co. (Sup. 1954), 133 N. Y. S. (2d), 785 the Ward case is also cited but merely to emphasize that the legislative amendment had expressly excepted truck cranes from the Motor Vehicle Act.

Similarly the N. Y. Court of Appeals, in People v. Jarka Corp. (1941), 285 N. Y., 548, 33 N. E. (2d), 239, held a tractor crane was not within the definition of a motor vehicle. Again this was a complete vehicle and not merely a chassis made for a special purpose.

5. There are several opinions by the Attorney General of Ohio which shed some light on the question,[4] although not exactly in point. They do, to a degree, indicate the legislative intent of excepting from the definition of a "motor vehicle," vehicles designed and used for a specific, a dedicated purpose which does not primarily involve the general use of the highway. The chassis herein involved were so designed and were not used for any other purpose.

6. Conceding that there is no express provision in the Motor Vehicle Act which would exclude from the definition of motor vehicles, a chassis specially designed for ultimate use and incorporation in a power crane, the fundamental purpose of the entire Motor Vehicle Act may be

---

4. Op. Atty. Gen. 1953-54. No. 3398. The opinion related to liability for use tax, §5728.06 R. C., of a commercial tractor regularly operated in combination with trailers or semi-trailers. The Attorney General discusses the definition of a semi-trailer. It is defined, §5728.01 R. C., as "everything on wheels which is not self-propelled, *except* vehicles or machinery not designed for or employed in general highway transportation and except * * *." The word "commercial tractor" is somewhat similarly defined in using the words "designed and used."

The opinion in part reads: "The exception in this definition relating to vehicles not designed for or employed in general highway transportation is indication of a legislative intent to include in the category of "vehicles" designed and used for carrying property on a public highway, all those which were so designed and used in the course of highway transportation operations. This latter term is not defined in the statute, and it is appropriate, therefore to consider that the expression is here employed in its usual and ordinary sense. Although such usual meaning may not readily be stated with absolute precision, it is fair to suppose that this language was intended to exclude vehicles which were only casually or in isolated instances used in highway transportation. * * * This noton that expression 'designed and used'—signifies a general or primary, or dedicated use, rather than a current actual use, is supported by the reference in the definition to * * *." After quoting the definition of "designed and used" in Webster's New International Dictionary, the opinion continues:

"These definitions would indicate that the word 'designed' as here employed, refers not merely to a structural or engineering design, but to the general use to which the owners concerned intend or purpose to put the vehicle in question."

Op. Atty. Gen. (1954) No. 3399: In this opinion the question related to an agricultural tractor as distinguished from a commercial tractor, §4511.01 R. C., and liability for a use tax, §5728 R. C.

After some discussion of the word "design," the opinon continues:

"General highway transportation indicates a customary, usual, and common use of the vehicle as distinguished from an occasional or sporadic use, divorce from, or ancillary to its primary and principal and dedicated purpose. Thus a vehicle used principally for agricultural purposes is, ipso facto, neither designed for nor employed in general highway transportation * * * That the vehicle is intended and dedicated to that agricultural purpose is presumed, prima facie, from the fact of its being so used.'

considered by a court. Also, the court may also consider the manner of administration of the law.

In the case at bar both parties called as witnesses, officials in charge of administration. As appears from finding of fact No. 20 they knew of no instance in which chassis such as those herein involved were required to comply with it.

Both of these two features are touched upon in the well-considered opinion in State ex rel. Tejan v. Lutz, supra. The court said: "Courts will not follow the letter of the statute when it leads away from the true intent and purpose of the legislation and to conclusions inconsistent with the general purpose of the Act."

Again: "While it does not appear to be absolutely necessary to have recourse to administration practices as an aid in interpreting the law, the relator and defendant have referred to them and this court does not wish to ignore them."

To repeat, it would seem contrary to the underlying purpose of the Motor Vehicle Act, to hold that a chassis admittedly designed to become the base of a power crane (and in fact later so used) driven on the highway to fulfill its purpose, is a motor vehicle and not excepted by the definition, when the power crane, for which it was designed, is clearly excepted.

## OPINION

By McNAMEE, District Judge.

The petition for review presents novel and interesting questions of fact and law which were decided adversely to the petitioner by the referee.

After a careful review of the record I am of the opinion that the decision of the referee must be affirmed. The referee held, in effect, that the two crane carriers in question were components of "power cranes"—which are specifically excepted by statute from the legislative definition of "motor vehicles." This was correct. The crane carriers are embryonic power cranes and in their undeveloped state are within the exception that applies to the completed unit. The delivery of a certificate of title or Manufacturer's Statement of Origin was not necessary to transfer title.

On the issue whether irrespective of the Motor Vehicle Law the parties intended to transfer title to Browning, the referee made findings which support his conclusions of law. He held: "The giving of a note and mortgage was not a condition precedent to passing title" and that "If that had been Dart's intention, it was waived by its conduct as appears from the findings of fact. Title as well as possession passed to Browning prior to December 9, 1953." See 46 Am. Jur., p. 612, Sec. 446, id., p. 613, Sec. 488.

There is a rational basis in the evidence for the referee's determinations, and his decision is affirmed.